IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

Mary Duren,                    )
                               )    Civil Action No. 6:13-3142-RBH-KFM
                Plaintiff,     )
                               )    **REPORT OF MAGISTRATE JUDGE**
        vs.                    )
                               )
Carolyn W. Colvin, Acting      )
Commissioner of Social Security,    )
                               )
                Defendant.     )
_____)

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a)(D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on June 7, 2011, alleging that she became unable to work on July 7, 2011 (amended onset date). The applications were denied initially and on reconsideration by the Social Security Administration. On February 1, 2012, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Carroll H. Crawford, an impartial vocational expert, appeared on March 21,

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

2013, considered the case *de novo*, and on May 2, 2013, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on September 16, 2013. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)    The claimant meets the insured status requirements of the Social Security Act through June 30, 2016.
>
> (2)    The claimant has not engaged in substantial gainful activity since July 7, 2011, the amended alleged onset date (20 C.F.R §§ 404.1571 *et seq*, and 416.971 *et seq.*).
>
> (3)    The claimant has the following severe impairments: pulmonary sarcoidosis and chronic obstructive pulmonary disease (20 C.F.R. §§ 404.1520(c) and 416.920(c)).
>
> (4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> (5)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity of no lifting or carrying over 20 pounds occasionally and 10 pounds frequently; with a 60-minute sit/stand option at the workstation; and in an environment free from dust, fumes, gasses, odors, and extremes of temperature and humidity.
>
> (6)    The claimant is capable of performing past relevant work as a dispatcher. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. §§ 404.1565 and 416.965).
>
> (7)    The claimant has not been under a disability, as defined in the Social Security Act, from July 7, 2011, through the date of this decision  (20 C.F.R. §§ 404.1520(f) and 416.920(f)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment.  20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary.  *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  SSR 82–62, 1982 WL 31386, at *3.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).  He

3

must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there

4

is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was born on May 27, 1953 (Tr. 59), and she was 58 years old on her amended alleged disability onset date (July 7, 2011). She was 59 years old on the date of the ALJ's decision (May 2, 2013). She obtained a GED (Tr. 31) and has past relevant work as a housekeeper and a dispatcher (Tr. 98). She alleges that she became disabled to work on July 7, 2011, due to sarcoidosis; problems with her thyroid, kidney, and liver; hepatitis C; reflux; and depression (Tr. 92).

***Medical Evidence***

On February 4, 2010, the plaintiff underwent a renal ultrasound at Columbia Nephrology, which showed bilateral renal atrophy (Tr. 341). On March 2, 2011, Koshy Abraham, M.D., diagnosed the plaintiff with chronic kidney disease stage 1 (Tr. 339). On March 23, 2011, Dr. Abraham found the plaintiff's kidney disease was stage two to stage three with underlying aterionephrosclerosis. Her recent kidney injury might be related to her hypercalcemia (Tr. 337). On May 11, 2011, Dr. Abraham classified the plaintiff's kidney disease to be stage 3 with underlying sarcoidosis. He recommended a pulmonary consult (Tr. 335). On June 29, 2011, the plaintiff was seen for a followup of her hypercalcemia and sarcoidosis with chronic kidney disease, stage three. He recommended prednisone after her scheduled lung biopsy (Tr. 333).

On October 11, 2010, the plaintiff was seen by Ziad Mattar, M.D., of Kershaw Health Medical Center for left foot pain. She had normal lower extremity ankle brachial indices at rest. She had minimal fall in the right ankle pressure with exercise and a fall in the left ankle brachial pressure after exercise (Tr. 279). On May 26, 2011, Dr. Mattar diagnosed the plaintiff with pulmonary sarcoidosis. She had shortness of breath and could only walk short distances. She experienced a cough, dyspnea on exertion, and shortness

5

of breath.    The plaintiff was referred for a punch/wedge biopsy (Tr. 399-400).    On September 22, 2011, Dr. Mattar noted that the plaintiff had undergone a wedge biopsy in July and was found to have noncaseating granuloma consistent with sarcoidosis.    The plaintiff reported shortness of breath, dyspnea on exertion, and a tight feeling in her chest. Dr. Mattar started her on prednisone long term therapy.    The plaintiff was comfortable breathing at rest but had labored breathing with movement (Tr. 401-02).

On February 16, 2012, the plaintiff was prescribed a Proventil solution inhaler for shortness of breath with exertion (Tr. 476).    On July 25, 2012, Sally Wooten, M.D., saw the plaintiff for shortness of breath and increased episodes of esophageal spasms.    She reported intermittent chest pain and dysphagia.    Carafate was prescribed in addition to Nexium (Tr. 472-73).    On October 4, 2012, the plaintiff reported occasional shortness of breath with exertion.    She was still taking prednisone and Proventil (Tr. 469-70).

On October 31, 2012, Dr. Mattar completed a Pulmonary Medical Source Statement for the plaintiff. He indicated that he had treated the plaintiff since May 26, 2011, for pulmonary sarcoidosis.    Her symptoms included shortness of breath, chest tightness, and fatigue.    Her impairments were consistent with the symptoms and functional limitations indicated in the evaluation.    Her experience of pain and other symptoms were occasionally severe enough to interfere with attention and concentration needed to perform even simple work tasks. The plaintiff was being treated with prednisone and her prognosis was fair.    Dr. Mattar opined that the plaintiff could walk one to two blocks without rest or severe pain. With regard to the amount of time the plaintiff could sit at one time, he circled both forty-five minutes and two hours.    With regard to the amount of time the plaintiff could stand at one time, he circled both twenty minutes and one hour.    He opined that she could sit for a total of at least six hours and could stand/walk a total of about two hours in an eight-hour work day.    Dr. Mattar indicated that the plaintiff could frequently lift up to twenty pounds and checked both "occasionally" and "rarely" with regard to the plaintiff's ability to lift fifty

6

pounds. She could occasionally or frequently twist, stoop, crouch/squat, and climb ladders or stairs. She should avoid concentrated exposure to extreme cold, heat, high humidity, wetness, cigarette smoke, perfumes, soldering fluxes, solvents/cleaners, fumes, odors, gases, dust, chemicals, and other irritants. The plaintiff's impairments were likely to produce good days and bad days. He stated the plaintiff would not need to take unscheduled breaks. Dr. Mattar estimated that the plaintiff would miss three or four days per month due to her impairments or treatment (Tr. 488-91).

On March 3, 2011, the plaintiff was treated at Community Medical Clinic of Kershaw County for left-sided back pain. She was prescribed Flexeril (Tr. 304). On April 7, 2011, she was seen for a followup visit for a painful right shoulder. She was again prescribed Flexeril (Tr. 306).

On April 12, 2011, a pulmonary function test was compatible with mild obstructive pattern, and a full pulmonary function test was recommended (Tr. 319, 321). On May 31, 2011, a chest CT showed chronic obstructive pulmonary disease ("COPD") changes and multiple granulomatous lymph nodes. There was a small focal area of increased interstitial markings around the right hilum (Tr. 328). On June 28, 2011, an enhanced chest CT showed granuloma in the right middle lobe and granulomas in the spleen and liver (Tr. 329).

On June 22, 2011, the plaintiff saw Scott J. Petit, M.D., at Carolina Cardiac Surgery on referral for consideration of an open lung biopsy (Tr. 390). On July 7, 2011, the plaintiff was admitted to Palmetto Health Heart Richland Hospital, and Dr. Petit performed a right lung biopsy of the upper, middle, and lower lobes and a right thoracoscopy. There was no obvious pathology, and the histologic features were compatible with the plaintiff's history of sarcoid. The plaintiff was discharged on July 12, 2011 (Tr. 349-61).

On September 23, 2011, the plaintiff saw Eric A. Horst, M.D., for an evaluation of her hypercalcemia. She was being seen by nephrology for renal disease for the past two

7

years.  She felt fair with moderate fatigue.  She also had a history of hypothyroidism for several years (Tr. 408-10).  On October 28, 2011, Dr. Horst noted a resolution of the hypercalcemia with the initiation of prednisone therapy for sarcoidosis (Tr. 422).

### Physical Residual Functional Capacity Assessments

On October 14, 2011, Rebecca Meriweather, M.D., opined that the plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, sit for six hours and stand/walk for six hours in an eight-hour workday.  She could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl (Tr. 66-69).  The plaintiff should avoid concentrated exposure to extreme cold, heat, wetness, humidity, and avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation (Tr. 68).  On January 25, 2012, James Weston, M.D., opined the same (Tr. 96-97).

### Psychological Evidence

On November 29, 2011, the plaintiff was seen for depressed mood, decreased energy, decreased appetite, psychomotor retardation, and passive suicidal ideation at Santee Mental Health.  She had a depressed mood and blunted affect.  Her Global Assessment of Functioning ("GAF") score was a 55.[2]  She was prescribed Paxil (Tr. 440).  The plaintiff returned on December 15, 2011 with an improved mood with Paxil and a GAF score of 65[3] (Tr. 442-43).

### Hearing Testimony

During the administrative hearing, the plaintiff testified that she was 59 years old, married, and lived with her spouse.  She completed a GED and had no further

---

[2]A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." See Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (Text Revision 4th ed. 2000) ("*DSM-IV*").  A GAF score of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

[3]A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. *Id.*

education.  She was 6'0" and weighed 180 pounds.  She did not have a valid driver's license because she did not drive due to her medications.  She had never had a driver's license, but she had a permit.  Her husband drove her to the hearing.  The plaintiff had applied for the permit because she was going to try to learn how to drive, but she had been too sick to take lessons (Tr. 30-33).

The plaintiff reported that she last worked on July 5, 2011, as a housekeeper at a hotel.  She had worked there since 2008.  She worked for another hotel as a housekeeper from 2002 to 2008.  Prior to that, she worked as a dispatcher for a cab company (Tr. 33-36).

The plaintiff's medical conditions included sarcoidosis, depression, and a history of chronic kidney disease.  She saw her kidney doctor once a year and was taking Lisinopril for her kidneys and her high blood pressure.  She was diagnosed with kidney problems in 2008 or 2009.  She also took medications for hypertension and hypothyroidism. She had seasonal allergies and gastroesophageal reflux.  The plaintiff took prednisone regularly since July 2011.  In July of 2011 she had undergone a biopsy on her right lung. She stayed in the hospital for a week, and it was determined that she had sarcoidosis and COPD.  She took a Proventil inhaler for her COPD.  She took Paxil for depression and was seen every three months at the Kershaw County Mental Health Clinic (Tr. 36-40).

The plaintiff testified that she did not feel she could perform her past work. She could no longer be a housekeeper because the chemicals that she used aggravated her sarcoidosis.  The plaintiff did not feel she could work as a dispatcher because she did not really know how to do the job as she was in training the entire time that she was there. The plaintiff also stated that she could not sit for too long.  The Lisinopril made her drowsy, tired, and sick.  She also felt that the Paxil contributed to her drowsiness.  She had not reported the medication side effects because she had been told that she would experience side effects, and she did not see any reason to complain.  She also testified that she had

9

spasms in her leg that were like restless leg syndrome. She had those symptoms for about a year, and she had reported them to her doctor at the free clinic. The plaintiff estimated that she could sit for three or four hours. She testified that she could stand for about an hour or so before she would need to sit down. If she stood longer, she got a heaviness in her chest. She could walk about a block or a block and a half with her inhaler. She would need to stop walking for about five minutes before she could walk again (Tr. 41-48).

The plaintiff's husband did the grocery shopping and household chores. The plaintiff could lift a certain amount of weight with her right arm, but she could not go far because of the operation on her lung. The ALJ noted that a few pieces of tissue were taken during the biopsy, and it had been years prior to the hearing. The plaintiff responded that the places from which they took the tissue healed in keloids and that brought her pain. She could lift ten to fifteen pounds on the right, if that much. She did not have problems lifting on the left (Tr. 48-49).

The plaintiff testified that on a really bad day she would not get out of bed because she was feeling bad from the medications and the pain in her lungs. Her husband had to do everything for her. She had a tendency to get bad headaches, but she did not take prescription medication for them because she was already taking so many other medications. The plaintiff said she had ten really bad days in a month and ten to fifteen good days. The plaintiff testified that she also had hepatitis C and was receiving injections (Tr. 50-53).

The vocational expert ("VE") classified the plaintiff's past work as that of motel housekeeper, SVP 2, light and unskilled, DOT No. 323.687-014; and dispatcher, SVP 3, sedentary and semi-skilled, DOT No. 913.367-010. The plaintiff testified that as a dispatcher she was sitting and standing. She also stated that she did not use a computer when she did that job, and she did not have any computer skills (Tr. 54-55).

The ALJ proposed the following hypothetical:

10

> Assume an individual of the claimant's age, education, and job experience who is limited to performing work with restrictions that require no lifting or carrying over a total of 20 pounds occasionally and 10 pounds frequently. The individual would have a 60-minute sit/stand option at the work station and an environment reasonably free from dusts, fumes, gases, odors, and extremes of temperature and humidity.

(Tr. 55-56).

The VE testified that the individual would be able to return to her past job as a dispatcher. She would be able to perform such work as described by the claimant and as generally performed in the national economy. The representative asked if the individual's impairments caused him or her to miss four or five days of work per month, would it hinder or limit the ability to perform the work as required. The VE testified that there would no full time work at any exertional level (Tr. 56-57).

## ANALYSIS

The plaintiff argues that the ALJ erred by (1) failing to properly consider Dr. Mattar's opinion; (2) failing to properly evaluate her credibility; (3) failing to perform an analysis of her past relevant work; and (4) failing to resolve the VE's testimony, which was contradicted by the *Dictionary of Occupational Titles* ("*DOT*").

### Treating Physician

The plaintiff argues that the ALJ erred in giving Dr. Mattar's opinion only partial weight (pl. brief at 15-19). The regulations require that all medical opinions in a case be considered, 20 C.F.R. §§ 404.1527(b), 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650,

654 (4th Cir. 2005). However, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

As more fully set forth above, on October 31, 2012, Dr. Mattar completed a Pulmonary Medical Source Statement for the plaintiff (Tr. 488-91). The ALJ considered the opinion and gave it "partial weight" (Tr. 18-19). He adopted Dr. Mattar's proposed environmental restrictions, which were generally consistent with the State agency assessments (Tr. 68, 97), but rejected Dr. Mattar's opinions that the plaintiff could lift and carry up to fifty pounds, would miss three or four days of work per month, and occasionally lacked sufficient attention/concentration to perform even simple tasks (Tr. 19) (citing Tr. 488-91)). The ALJ found that Dr. Mattar overestimated the plaintiff's ability to lift and carry,

12

as other evidence supported a limitation to twenty pounds occasionally and ten pounds frequently (Tr. 19).

The plaintiff specifically argues that the ALJ erred in failing to adopt Dr. Mattar's opinion that she would be absent from work about three to four days per month. The ALJ specifically discounted Dr. Mattar's finding because it was neither supported by nor consistent with Dr. Mattar's own treatment notes, which reflect conservative treatment limited to routine office visits and relatively normal mental and physical examinations (Tr. 18-19; *see* Tr. 399-400, 401-02, 469, 473, 475, 478-79, 480-81). As noted by the Commissioner, on October 4, 2012, less than one month before he opined that the plaintiff had debilitating respiratory limitations, Dr. Mattar noted during an office visit that the plaintiff was "DOING MUCH BETTER" on Prednisone (Tr. 469) (emphasis in original). The plaintiff denied present shortness of breath and reported only "occasional [shortness of breath] with exertion but not routinely" (*id.*). She also denied fatigue (*id.*), which is one of the symptoms that Dr. Mattar identified in his questionnaire (Tr. 488). During the same visit, Dr. Mattar decreased the plaintiff's dosage of Prednisone from 10 mg to 7.5 mg (Tr. 470), though he stated in his questionnaire that the plaintiff was still taking 10 mg per day (Tr. 489).

The ALJ further noted (Tr. 18-19) that Dr. Mattar's assessment was inconsistent with: the plaintiff's conservative treatment history, which included routine office visits and no emergency hospitalizations; pulmonary function testing showing only mild abnormalities (Tr. 319); unremarkable examinations by other medical providers (Tr. 304-16, 333-43, 353, 355, 409, 420); and Dr. Mattar's opinion that the plaintiff could lift and carry fifty pounds and did not require unscheduled breaks, which appeared to conflict with his assertion that the plaintiff would frequently miss work due to her impairments (Tr. 490-91). The ALJ also noted other internal contradictions in the medical source statement, as Dr. Mattar simultaneously indicated that the plaintiff could: (1) sit for forty-five minutes at a time and two hours at a time and (2) stand for twenty minutes at a time and one hour at a

13

time (Tr. 18-19) (citing Tr. 490)).  Finally, the ALJ noted that the plaintiff showed no discernible mental or physical deficits during meetings with a Social Security Administration employee and a vocational rehabilitation counselor (Tr. 19-20) (citing Tr. 210-11, 435)).

The plaintiff argues that it is not clear how Dr. Mattar's opinion as to her likely absenteeism was inconsistent with his conclusion that she could occasionally to rarely lift fifty pounds and did not need unscheduled breaks (pl. brief at 16-18).  However, the undersigned finds reasonable the ALJ's conclusion that someone who could lift fifty pounds without any unscheduled breaks during an eight-hour workday, as Dr. Mattar proposed, was likely not suffering from symptoms or effects that would cause her to miss work entirely (Tr. 19).

Furthermore, substantial evidence supports the ALJ's decision to accord greater weight to the State agency Physical RFC Assessments, which were more consistent with the objective clinical and diagnostic evidence showing only mild abnormalities (Tr. 24) (citing Tr. 66-69, 95-97)). *See* 20 C.F.R. §§ 404.1527(e)(2)(I), 416.927(e)(2)(i) ("State agency medical . . . consultants . . . are highly qualified physicians . . . who are also experts in Social Security disability evaluation.  Therefore, administrative law judges must consider findings and other opinions of State agency medical . . . consultants . . . as opinion evidence, except for the ultimate determination about whether you are disabled."). *See also* SSR 96-6p, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from State agency medical . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources."); *Campbell v. Bowen*, 800 F.2d 1247, 1250 (4th Cir.1986) (Fourth Circuit cases "clearly contemplate the possibility that [treating physician] opinions may be rejected in particular cases in deference to conflicting opinions of non-treating physicians."); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir.1984) ("[T]he testimony of a non-examining, non-treating physician should be discounted and is not substantial evidence when totally contradicted by other evidence in the record. . . . [W]e have also ruled

14

that the testimony of a non-examining physician can be relied upon when it is consistent with the record.") (citations omitted).  Notably, the ALJ assessed an RFC that was even more favorable to the plaintiff than the State agency physicians proposed, further restricting the plaintiff to jobs that would permit her to alternate between sitting and standing every sixty minutes (Tr. 22), which is consistent with the plaintiff's testimony that she could stand for about an hour before needing to sit down (Tr. 46-47).

Based upon the foregoing, the undersigned finds that the ALJ properly weighed the medical opinion evidence, and this allegation of error fails.

### Credibility

The plaintiff next argues that the ALJ failed to properly consider her credibility. The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process.  First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996).  In *Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006), a Fourth Circuit Court of Appeals panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d at 565.  However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or

muscle tissue, muscle spasm, or sensory or motor disruption), if available should be obtained and considered.'" *Id.* at 564 (quoting SSR 90-1p, 1990 WL 300812).

> The court further acknowledged:

> > While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

*Id*. at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled.  However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.").

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's

16

credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4. Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)    the individual's daily activities;

(2)    the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)    factors that precipitate and aggravate the symptoms;

(4)    the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)    treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)    any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)    any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3. *See* 20 C.F.R. §§ 404.1529(c), 416.929(c).

The ALJ found that, while the plaintiff's medically determinable impairments could reasonably be expected to cause some of her alleged symptoms, the plaintiff's allegations regarding her impairments, symptoms, and ability to work were not fully credible (Tr. 24). Specifically, the ALJ provided the following reasons for discounting the plaintiff's credibility: (1) she did not tell her doctors about the medication side effects she reported

17

in connection with her DIB and SSI applications; (2) treatment records indicated that she responded well to medication;(3) her reported daily activities were not limited to the extent one would expect given her complaints; (4) she did not tell doctors that her symptoms left her bedridden ten days per month, as she testified; and (5) her appearance and demeanor during the hearing revealed no obvious physical or mental deficits (Tr. 22-24).

The plaintiff first argues that the ALJ attached too much significance to her "limited activity" (pl. brief at 26). She contends that "the ALJ does not state which activities are not what he expected, and [the plaintiff] submits that feeding herself, independently using the toilet, making a sandwich or a microwaveable meal, and shopping twice a month are not contradictory to allegations of an inability to work" (*id.*). However, in assessing the plaintiff's credibility, the ALJ properly juxtaposed the plaintiff's reports of profound physical and mental limitations — e.g., that she was completely bedridden ten days per month (Tr. 51-52) and was impaired in every activity except talking, hearing, and seeing (Tr. 238) — against evidence that she was capable of engaging in independent activities of daily living, including caring for herself, shopping, handling money, reading, watching television and movies, visiting friends, and attending church (Tr. 23-24) (citing Tr. 50-52, 233-38)). Although the plaintiff is correct that she "need not be bedridden or completely helpless to be found disabled" (pl. brief at 27) (citing *Totten v. Califano*, 624 F.2d 10 (4th Cir. 1980)), her ability to perform even the most mundane tasks is significant given her allegations of extreme functional limitations that prevented her from doing anything, including getting out of bed, for one third of the month (Tr. 50-51). 20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i) (stating an ALJ must consider a claimant's daily activities). *See Miles v. Astrue*, No. 6:11-cv-2740-RMG-KFM, 2012 WL 5385641, at *11 (D.S.C. Oct. 4, 2012) (holding that ALJ's consideration of such activities as preparing simple meals, doing light vacuuming, loading the dishwasher, playing the guitar and video games, and driving, was appropriate given claimant's "assertions regarding extreme limitations in functioning"),

*adopted by* 2012 WL 5385639 (Oct. 31, 2012).  Moreover, to the extent that the ALJ may have improperly relied on the plaintiff's daily activities, the error is harmless because the ALJ gave several other reasons for his credibility finding that were supported by substantial evidence. *Mickles v. Shalala*, 29 F.3d 918, 921 (4th cir.1994) (finding the ALJ's error harmless where the ALJ would have reached the same result notwithstanding).

Next, the plaintiff argues that the ALJ improperly relied on the fact that the treatment records do not reflect side effects of drowsiness, dizziness, and nausea, which had been indicated by the plaintiff in a function report and in her testimony at the hearing (pl. brief at 27; *see* Tr. 23 (citing Tr. 45, 240)). The plaintiff notes that she testified at the hearing that she did not report the side effects to her doctors because the doctors had told her side effects were possible and she did not see any reason to complain (pl. brief at 27 (citing Tr. 44)).  However, the ALJ was not required to accept the plaintiff's self-serving explanation in the face of other evidence that she overstated her symptoms and understated her abilities (Tr. 22-24).  Although the plaintiff cited "dizziness, drowsiness, [and] nausea" as side effects of Prednisone (Tr. 240), Dr. Mattar identified no such effects in his October 2012 questionnaire, stating only that the plaintiff might gain weight if she were to take a higher dose of Prednisone than prescribed (Tr. 489).  Moreover, as argued by the Commissioner, even if the plaintiff saw no reason to initiate complaints of dizziness, drowsiness, and nausea, it would not explain why she specifically denied such symptoms when doctors asked about them (*see* Tr. 469) ("She keeps on taking prednisone 10mg daily, denies any skin lesions, visual changes or other symptoms . . . . Denies: … FATIGUE"). *See* SSR 96-7p, 1996 WL 374186, at *5-6 (instructing ALJs to consider consistency of claimant's statements in evaluating credibility).

The plaintiff next argues that the ALJ "engaged in what had been condemned as 'sit and squirm' jurisprudence when he wrote that [the plaintiff] betrayed no evidence of any significant discomfort while testify at the hearing" (pl. brief at 28 (citing Tr. 24)).  The

undersigned disagrees.  It is permissible for the ALJ to consider in the credibility analysis, as one factor out of many, his observations at the hearing. *Massey v. Astrue*, C.A. No. 3:10-2943-TMC, 2012 WL 909617, at *4 (D.S.C. Mar. 16, 2012) ("As to the sit and squirm observations, the ALJ may not solely base a credibility determination on his observations at a hearing; however, the ALJ may include these observations in his credibility determination.") (citations omitted); SSR 96-7p, 1996 WL 374186, at *8 (ALJ may consider personal observations of claimant but may not accept or reject the claimant's complaints solely on the basis of such personal observations).  Here, the ALJ considered several factors in making the credibility determination as set forth above.

Based upon the foregoing, the undersigned finds that the ALJ properly assessed the plaintiff's credibility, and the plaintiff has not met her burden of showing that the evidence supports a more-restrictive RFC assessment.

### Past Relevant Work

The plaintiff argues that remand is required because the ALJ did not comply with Social Security Ruling ("SSR") 82-62 in finding that she could return to her past relevant work (pl. brief at 17-19). SSR 82-62 discusses what is required for an ALJ to find a claimant capable of performing past relevant work:

> In finding that an individual has the capacity to perform a past relevant job, the determination or decision must contain among the findings the following specific findings of fact:
>
> 1. A finding of fact as to the individual's RFC;
>
> 2. A finding of fact as to the physical and mental demands of the past job/occupation; and
>
> 3. A finding of fact that the individual's RFC would permit a return to his or her past job or occupation.

1982 WL 31386, at *4.  In making these findings, an ALJ may consult a VE to provide evidence "concerning the physical and mental demands of a claimant's past relevant work, either as the claimant actually performed it or as generally performed in the national

economy," as well as whether an individual with the claimant's RFC could return to such work. 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2).

Here, the ALJ's decision contains the three findings that SSR 82-62 requires: (1) a finding as to the plaintiff's RFC (Tr. 22-24); (2) a finding as to the physical and mental demands of the plaintiff's past work as a dispatcher – i.e., sedentary and semi-skilled - through testimony from the VE and the plaintiff and reference to the *DOT* job number (*DOT* No. 913.367-010) (Tr. 25; *see* Tr. 36, 55); and (3) a finding that the plaintiff's RFC allowed her to return to her past work as actually and generally performed (Tr. 25; *see* Tr. 55-56). *See, e.g., Ray v. Colvin*, C.A. No. 5:12-cv-03307-DCN, 2014 WL 1093075, at *11 (D.S.C. Mar. 17, 2014) (holding that similar findings satisfied ALJ's obligation under SSR 82-62).

The plaintiff argues that the ALJ erred by failing to provide "specific findings [and] analysis regarding the physical and mental demands of [her past relevant work]" (pl. brief at 22). The undersigned agrees with the Commissioner that, although the ALJ could have made more detailed findings, he satisfied SSR 82-62 by providing a *DOT* number and occupational title that corresponds with the plaintiff's past work (Tr. 24). Evidence of the physical and mental requirements of a particular job may be found in the *DOT*. *See Deloatche v. Heckler*, 715 F.2d 148, 151 (4th Cir.1983) (holding that "the [Commissioner] may rely on the general job categories of the [*DOT*] as presumptively applicable to a claimant's prior work"); *see also Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir.1990) (observing that ALJs routinely rely on the *DOT* "in determining the skill level of a claimant's past work, and in evaluating whether the claimant is able to perform other work in the national economy") (citations omitted). In *Thomas v. Astrue*, a court in this district held that "[e]vidence of the physical and mental requirements of a particular job may be found in the *DOT*," and the ALJ satisfied his obligation to make specific findings regarding the demands of the plaintiff's past relevant work by providing the exact *DOT* number and name of the claimant's past jobs. No. 08-cv-2847-PJG, 2010 WL 844756, at *7 (D.S.C. Mar. 3, 2010).

21

The court noted that "even if the ALJ's failure to specifically enumerate the physical and mental requirements within the text of the opinion is error, it is harmless," because the claimant did not provide any evidence that his past relevant work differed from the *DO*T occupations that the VE identified as compatible with his RFC. *Id*.

Here, like the claimant in *Thomas*, the plaintiff argues generally that the ALJ did not satisfy SSR 82-62's narrative requirements; however, she does not explain how the alleged error affected the ALJ's determination that she could perform her past work either as she actually performed it *or as it is generally performed in the national economy*. *See* 20 C.F.R. §§ 404.1560(b)(2), 404.1566(b), 416.960(b)(2), 416.966; SSR 82-62, 1982 WL 31386, at *3 ("The RFC to meet the physical and mental demands of jobs a claimant has performed in the past (either the specific job a claimant performed or the same kind of work as it is customarily performed throughout the economy) is generally a sufficient basis for a finding of 'not disabled.'"). As the Fourth Circuit has acknowledged, the plaintiff was required at step four to show that she could not return to her "previous work (i.e., occupation), and not simply to her specific prior job." *DeLoatche*, 715 F.2d at 151. The Commissioner was entitled to rely on the general occupational categories in the *DOT* as presumptively applicable to the plaintiff's past relevant work, and it was incumbent on the plaintiff to rebut this presumption with evidence that the *DOT* category that the VE identified (*DOT* No. 913.367-010) was not representative of her past work. *Id*. The plaintiff does not argue that the VE improperly classified her past work in equating it to the dispatcher occupation described in the *DOT*. DICOT 913.367-010, 1991 WL 687822. Because the *DOT* description for that occupation fairly represents the plaintiff's past work, the ALJ properly relied on VE testimony that the dispatcher position involved physical and mental demands that were consistent with the plaintiff's RFC (Tr. 25) (citing Tr. 55-56). This is all that the ALJ was required to do at step four, and substantial evidence supports the

22

conclusion that the plaintiff was capable of returning to work as a dispatcher, either as she actually performed it or as generally performed.

The plaintiff next argues (pl. brief at 23) that remand is required because of a discrepancy between the ALJ's RFC finding that she must work in an environment "free from dust, fumes, gases odors, and extremes of temperatures and humidity," and his hypothetical question to the VE proposing that the environment need only be "reasonably free" from these environmental irritants (Tr. 55-56). The Commissioner notes (def. brief at 12) that the ALJ based his assessment of environmental limitations on Dr. Mattar's opinion that the plaintiff should "avoid concentrated exposure" to irritants (Tr. 19) (citing Tr. 491)). The undersigned agrees that it is thus likely that the ALJ's statement in the RFC assessment that the working environment must be "free from" irritants was a typographical error. *See Quaite v. Barnhart*, 312 F. Supp. 2d 1195, 1199-1200 (E.D. Mo. 2004) (holding that mere typographical or clerical error did not require reversal). Moreover, even if the hypothetical did not reflect the plaintiff's precise limitations as found by the ALJ in the RFC assessment, the alleged error is harmless. According to the *DOT* and its companion publication, the *Selected Characteristics of Occupations* ("SCO"), the dispatcher position does not require any exposure to environmental irritants, other than noise, which is not relevant to the plaintiff's RFC. *See* DICOT 913.367-010, 1991 WL 687822 (stating that exposure to such environmental conditions "does not exist" for the dispatcher occupation).

Based upon the foregoing, the undersigned finds that any error in this regard is harmless and does not require remand.

### *Vocational Expert Testimony*

Lastly, the plaintiff argues that the ALJ did not comply with SSR 00-4p because he did not inquire about a purported conflict between (1) the VE's testimony that the plaintiff could perform her past work despite requiring a sit/stand option, and (2) the

*DOT* description of the plaintiff's past work, which is silent on the subject of sit/stand options

(pl. brief at 29-31). SSR 00-4p provides in pertinent part:

> When a [vocational expert ("VE")] . . . provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE . . . evidence and information provided in the [*Dictionary of Occupational Titles* ("*DOT*")]. In these situations, the adjudicator will:
>
> Ask the VE . . . if the evidence he or she has provided conflicts with information provided in the DOT; and
>
> If the VE's . . . evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.
>
> When vocational evidence provided by a VE . . . is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE . . . evidence to support a determination or decision that the individual is or is not disabled. The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.

2000 WL 1898704, at *4.

The Commissioner acknowledges that the ALJ did not specifically ask the VE about any possible conflict with the *DOT*, as required by SSR 00-4p. However, the Commissioner argues, and this court agrees, that the ALJ's failure to do so was harmless because there was no conflict for the ALJ to explore. *See Thompson v. Astrue*, C.A. No. 8:09-1968-JFA-BHH, 2010 WL 3878729, at *4-5 (June 16, 2010) (noting ALJ violated SSR 00-4p by failing to ask VE if there was any conflict between testimony and *DOT* but finding error was harmless as there was no conflict), *adopted by* 2010 WL 3880047 (D.S.C. Sept. 28, 2010). Further, because the *DOT* does not address the subject of sit/stand options, there was no apparent conflict between the VE's testimony and the *DOT*, and thus the ALJ's duty to obtain a reasonable explanation did not arise. *Zblewski v. Astrue*, 302 F. App'x 488, 494 (7th Cir. 2008) (holding that VE's testimony was not in apparent conflict with

*DOT* as *DOT* did not address sit/stand options, and thus ALJ did not err in failing to inquire into such). *See, e.g., Wait v. Colvin*, C.A. No. 1:13-cv-1363-TMC, 2014 WL 2979797, at *4 (D.S.C. June 27, 2014) ("[T]here is no conflict between VE testimony and the *DOT* where the *DOT* is silent as to the sit/stand option.").

The plaintiff also argues that a conflict exists because the *DOT* description of the dispatcher position does not contemplate her need to work in an environment completely free of irritants such as dust, fumes, and odors (pl. brief at 30). However, as discussed above, the *DOT/SCO* specifically addresses environmental conditions and provides that the dispatcher position does not require exposure to any irritants other than noise. *See* DICOT 913.367-010, 1991 WL 687822. Accordingly, there was no conflict.

Based upon the foregoing, these allegations of error are without merit.

### CONCLUSION AND RECOMMENDATION

The Commissioner's decision is based upon substantial evidence and is free of legal error. Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

January 13, 2015
Greenville, South Carolina

25